IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MARY SMITH and GEORGE SMITH,  )
individually; and MARY SMITH, as  )
administrator of the ESTATE OF MARCUS  )
DEON SMITH, deceased,  )
        )
        Plaintiffs,  )
        )
        v.  )        1:19CV386
        )
CITY OF GREENSBORO; GUILFORD  )
COUNTY; Greensboro police officers  )
JUSTIN PAYNE, ROBERT DUNCAN,  )
MICHAEL MONTALVO, ALFRED LEWIS,  )
CHRISTOPHER BRADSHAW, LEE  )
ANDREWS, DOUGLAS STRADER, and  )
JORDAN BAILEY; and Guilford EMS  )
paramedics ASHLEY ABBOTT and DYLAN  )
ALLING,  )
        )
        Defendants.  )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Marcus Deon Smith ("Smith") died after an encounter with eight City of Greensboro police officers ("the Officers") and two Guilford County EMS paramedics ("the Paramedics"). Smith's parents ("Plaintiffs") bring this action against the Officers, the Paramedics, and their respective employers ("Greensboro" and "Guilford County"), alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–34; and state law claims for wrongful death and battery. (ECF No. 1 ¶¶ 68–104.) Six motions are before the Court. The

Officers, the Paramedics, Greensboro, and Guilford County all move to dismiss the claims against them, (ECF Nos. 17; 20; 22; 25), while Plaintiffs move to amend their complaint and strike video evidence attached to certain Defendants' briefs, (ECF Nos. 35; 41).

For the reasons stated below, the Officers', Paramedics', and Greensboro's motions to dismiss will be granted in part and denied in part; Guilford County's motion to dismiss will be granted in full; Plaintiffs' motion to strike will be denied (though the court declines to consider the video evidence at this time); and Plaintiffs' motion to amend their complaint will be denied as futile.

## I.  BACKGROUND

On the morning of September 8, 2018, just after midnight, Smith was "pacing back and forth" along North Church Street near downtown Greensboro.  (ECF No. 1 ¶ 23–24.) Bipolar and schizophrenic, Smith was disposed to episodes of psychosis; delusions, paranoia, and hallucinations which impaired both his cognition and communication.  (*Id.* ¶ 22.) According to the complaint, eight City of Greensboro police officers encountered Smith "in the throes of a mental health crisis"—he was "exasperated and frantic," "running around in circles," and "waiving his arms in the air."  (*Id.* ¶¶ 23–24, 26.)  Smith "begged the officers for help" and asked to be taken to the hospital.  (*Id.* ¶ 24.)  The Officers called an ambulance and asked Smith to sit in the back of one of their squad cars until it arrived.  (*Id.* ¶ 28.)  After a brief time alone in the car, however, Smith "began to panic and thrash around."  (*Id.* ¶ 29.) He tried to open the car door and, finding it locked, "banged his hand against the window" in order to "get the [Officers'] attention."  (*Id.* ¶ 30.)

Meanwhile, two paramedics from the Guilford County Emergency Medical Service arrived on the scene. (*Id.* ¶ 33.) While Smith was still in the car, the Officers described his condition to the Paramedics, and one officer—Officer Duncan—suggested restraining Smith with a "belt-like strap" called a "RIPP Hobble." (*See id.* ¶¶ 31–32, 34.) Eventually, the Officers opened the car door. (*Id.* ¶ 35.) Without "kick[ing] or hitt[ing] or threaten[ing]" the Officers or Paramedics, Smith emerged from the car. (*Id.* ¶¶ 35–36.) Several of the Officers quickly "forced [Smith] down to the ground and then rolled [him] onto his stomach in the prone position." (*Id.* ¶ 37.) As the Officers held him down, Smith "cried out in pain." (*Id.* ¶¶ 38–39.) Officer Duncan handcuffed Smith's hands behind his back; then, Officer Payne grabbed Smith's ankles and pushed them backwards until his hands and feet were touching. (*Id.* ¶¶ 39–40.) Three Officers then used a RIPP Hobble to "hogtie" Smith—securing his hands to his feet behind his back, with his legs bent "well beyond a 90-degree angle." (*Id.* ¶¶ 40–41.) The hobble's binding was so tight that, lying on his stomach, Smith's shoulders and knees were "suspended above the ground." (*Id.* ¶ 42.)

The stress on Smith's chest constrained his breathing. (*Id.* ¶ 43.) "[W]heezing, moaning, groaning, [and] gasping for air," he quickly entered a state of "respiratory and physical distress." (*See id.* ¶¶ 44–45.) Four of the Officers were "right next to" Smith as he struggled to breathe, either holding him down or standing nearby. (*Id.* ¶ 47.) Likewise, both Paramedics were "standing next to" Smith as he lay there bound. (*Id.* ¶ 48.) None intervened. (*Id.* ¶¶ 47–48.) "[L]ess than half a minute" after his breathing became strained, Smith was fully "unable to breathe" and had become "unresponsive." (*Id.* ¶ 45.)

The Paramedics "waited longer than two minutes to begin any resuscitative efforts," despite being aware that Smith was "unconscious, unresponsive[,] and not breathing." (*Id.* ¶ 51.) They later placed Smith on a gurney and moved him inside of an ambulance, where their attempts to revive him failed. (*Id.* ¶¶ 50–51.) North Carolina's Office of the Chief Medical Examiner classified Smith's death as a homicide and listed several causes of death: "sudden cardiopulmonary arrest due to prone restraint; n-ethylpentalone, cocaine, and alcohol use; and hypertensive and atherosclerotic cardiovascular disease." (*Id.* ¶ 52.)

Smith's parents initiated this action for damages on April 10, 2019, alleging violations of the Fourth and Fourteenth Amendments; Title II of the ADA; and state law claims for wrongful death and battery. (*Id.* ¶¶ 68–104.) In a set of four motions, all Defendants now move to dismiss the claims against them. (ECF Nos. 17; 20; 22; 25.) Plaintiffs, for their part, move to amend their complaint and strike video evidence attached to certain Defendants' briefing. (ECF Nos. 35; 41.) The Court will address each motion in turn.

## II. LEGAL STANDARDS

Under Rule 12(b)(1), a party may seek dismissal based on the court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [their] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject matter jurisdiction rests with the plaintiff, and the

trial court may "consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Furthermore, when evaluating a Rule 12(b)(1) motion to dismiss, the court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

A motion to dismiss filed pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing a claim's plausibility, a court must draw all reasonable inferences in the plaintiff's favor. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). However, "mere conclusory and speculative allegations" are insufficient to withstand dismissal, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013), and a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Vitol*, 708 F.3d at 548 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006)).

## III.    DISCUSSION

### a.  Plaintiffs' Motion to Strike Video Evidence

Before considering the arguments for and against dismissal, the Court must first answer a threshold question: whether it is appropriate, at this early stage of the litigation, to consider video evidence of the events described in the complaint. In support of their motions to

dismiss, Greensboro and the Officers have submitted body-cam footage of the incident. (ECF No. 26-1.) Plaintiffs move to strike the footage and ask the Court to disregard all references to it in Defendants' briefing. (ECF No. 41.)

When a defendant challenges a claim under rule 12(b)(6), courts are ordinarily limited to considering the allegations set forth in the complaint. *Zak v. Chelsea Therapeutics Int'l*, 780 F.3d 597, 606 (4th Cir. 2015). The purpose of a Rule 12 motion, after all, is to test the sufficiency of the pleadings, not to resolve disputes. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). However, there are two narrow exceptions to this general rule. First, courts can consider extrinsic evidence attached to a motion to dismiss if "it was integral to and explicitly relied on in the complaint," so long as "the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quotation omitted). Second, courts may "take judicial notice of matters of public record." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Defendants argue that the video footage is "integral" to the complaint because it "depicts the entire interaction on 8 September 2018 from numerous perspectives." (ECF No. 51 at 8.) Plaintiffs acknowledge that the footage is comprehensive, and even state in their briefing that they "intend to rely on the body camera video at summary judgment and trial." (ECF No. 42 at 2–3.) The *complaint itself*, however, makes no express mention of the video. The factual allegations contained therein stand independent of the video, and may conceivably be proven without it (for instance, via witness testimony). Nor is there any indication from Plaintiffs that they actively relied upon the video in crafting the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[M]ere notice or possession [of extrinsic

evidence] is not enough."). Thus, the video is not "integral" to the complaint. *See, e.g., Slippi-Mensah v. Mills*, No. 1:15-cv-07750-NLH-JS, 2016 U.S. Dist. LEXIS 124719, at *8 (D.N.J. Sept. 14, 2016) ("Simply because a video that captured the events complained of in the complaint exists does not transform that video into a 'document' upon which the complaint is based.").

Nevertheless, Defendants suggest that the videos may "provide helpful context" to the Court as it considers the complaint's allegations. (ECF No. 51 at 16.)  In *Scott v. Harris*, the Supreme Court considered video evidence of a police chase when evaluating an officer's qualified immunity defense at summary judgment.  550 U.S. 372, 378–79 (2007).  The Court found that the video so clearly depicted the relevant events that "no reasonable jury" could have accepted the plaintiff's alternative rendition.  *Id.* at 380.  Thus, although the plaintiff had put forth evidence of his own, that evidence had become so "utterly discredited" by the video that no factual "dispute" remained.  *Id.*  Defendants believe that the body-cam footage at issue here could likewise shed light on Plaintiffs' allegations, such that, when viewed in their "full context," the claims "would not survive."  (ECF No. 51 at 8.)

It is worth emphasizing that *Scott* concerned the treatment of competing evidence *at summary judgment*—not the pleading stage.  At least one district court has applied *Scott* to consider video evidence when evaluating a motion to dismiss.  *See Koh v. Graf*, No. 11-CV-02605, 2013 WL 5348326, at *10 (N.D. Ill. Sept. 24, 2013).  However, this Court declines to do so.  No matter how comprehensive, the body-cam footage may still leave open questions of tone, perspective, and context—factual issues to be resolved at a later date.  *See Zak*, 780 F.3d at 606.  Furthermore, unlike in *Scott*, the parties have not had an opportunity to conduct

discovery.  If the allegations in the complaint are well pleaded, Plaintiffs deserve the opportunity to marshal what evidence they can in support.

Defendants also ask the Court to take judicial notice of the video evidence.  *See* (ECF No. 51 at 12–19); Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute.").  Pursuant to N.C. Gen. Stat. § 132-1.4A, Greensboro sought and was granted approval to post the body-cam footage on its public website.  (*See* ECF Nos. 23-4 at 3; 51 at 13).  It is true that courts are free to consider publicly available information posted on official websites, and often do.  *See e.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (considering "publicly available [statistics] on [a state's] official redistricting website").  However, Defendants are asking the Court to consider more than the fact of the video's public posting, or even some uncontroversial aspect of its content.  Rather, they seek to employ the video to challenge Plaintiffs' characterization of the facts and demonstrate that the Officers' behavior was reasonable.  As this request runs far beyond the usual purview of judicial notice, the Court exercises its power to "simply ignore[ ] [the] material" at this time. *See Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 193 & n.7 (4th Cir. 2015).

Lastly, Defendants raise several procedural objections to Plaintiffs' motion to strike. (*See* ECF No. 51 at 5–7.)  While Plaintiffs do not cite any Federal or Local Rule in support of their motion, the Court understands the motion to have been filed pursuant to Federal Rule of Civil Procedure 12(f).  A motion to strike under Rule 12(f) must be directed at a "pleading"—rather than, as here, an exhibit attached to a brief—and within a prescribed timeframe, which it appears Plaintiffs have exceeded.  *See* Fed. R. Civ. P. 12(f).  Here, however, those defects are irrelevant.  As the above discussion makes clear, this Court has inherent

discretion over whether to consider extrinsic evidence when assessing a motion to dismiss filed under rule 12(b)(6). Accordingly, while the Court will deny Plaintiffs' motion to strike the video evidence and related references, it nonetheless declines to consider said evidence at this stage of the proceedings.

### b. The Officers' Motion to Dismiss

Plaintiffs' complaint directs a total of five claims at the Officers in their individual capacities. Counts 1 and 2 comprise what is, essentially, a single claim for the violation of Smith's Fourth and Fourteenth Amendment rights.[1] (*See* ECF No. 1 ¶¶ 68–77.) Count 3 asserts a separate Fourteenth Amendment claim, this time on behalf of Smith's parents for the "deprivation of the right to familial relationships with [Smith]." (*Id.* ¶¶ 78–81.) Last, Counts 6 and 7 contain state law claims for wrongful death and battery, respectively. (*Id.* ¶¶ 92–101.)

---

[1] While these counts allege the same violative conduct—the deprivation of Smith's Fourth and Fourteenth Amendment rights—they are styled as distinct claims seeking distinct remedies. Count 1, which is captioned as "42 U.S.C. § 1983 – Wrongful Death," alleges harm to Smith's parents as a result of his death. (ECF No. 1 ¶¶ 68–71 ("Plaintiffs lost companionship, society, comfort and consortium with [Smith] and are entitled to damages for [his] pain [and] suffering.").) Count 2, in contrast, is captioned "42 U.S.C. § 1983 – Survival Action," and alleges harm that Smith himself incurred *apart from* his death. (*Id.* ¶¶ 72–77 ([Smith] sustained damages, including pain and suffering before death, and a loss of the enjoyment of life and other hedonic damages after death.").) As the Officers note, there is no federal statute directly governing the measure of damages in wrongful death and survivorship actions brought pursuant to § 1983. (*See* ECF No. 26 at 19–20). Thus, § 1988 compels the use of North Carolina state law "as the remedial reference point." *See Bowling v. Oldham*, 753 F. Supp. 588, 590 (M.D.N.C. 1990). With that in mind, the Officers argue that North Carolina's wrongful death statute, N.C. Gen. Stat. 28A-18-2, encompasses the injuries alleged in both Counts 1 and 2, and that the latter should therefore be dismissed as duplicative of the former. (*See* ECF Nos. 26 at 19–20; 50 at 10–11.) In response, Plaintiffs maintain that separate counts are necessary in case "any of [the] Defendants are found liable for injuring [Smith] but not for causing his death." (*See* ECF No. 40 at 18.) Given that this case is still in its infancy, and that this disagreement relates primarily to remedies, rather than the underlying allegations, the Court declines to make a decision on consolidation of these two claims at this stage of the proceedings.

Two of the aforementioned claims must be dismissed outright. With respect to Count 7, the parties agree that the battery claim is "encompassed by the wrongful death claim"; Plaintiffs abandon it voluntarily. (ECF Nos. 26 at 24; 40 at 20.) Likewise, both sides correctly recognize that Count 3 has no legal basis in the Fourth Circuit. (*See* ECF Nos. 26 at 20; 40 at 18); *see Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994) (declining to extend "the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally."). Thus, three claims remain against the Officers—Counts 1, 2, and 6—and comprise the heart of Plaintiffs' complaint: that the Officers wrongfully caused Smith's death through the use of excessive force.

### 1. Excessive Force / Qualified Immunity

The Court begins with Plaintiffs' § 1983 claims against the Officers. Pursuant to the doctrine of qualified immunity, government officials are shielded from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013). As qualified immunity "is an *immunity from suit* rather than a mere defense to liability," the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). However, a defendant who raises qualified immunity in a 12(b)(6) motion "faces a formidable hurdle"—because dismissal at this early stage "is appropriate only if a plaintiff fails to state a claim that is *plausible* on its face," the defense "is usually not successful." *See Owens v. Balt. City State's Attorneys Office*,

767 F.3d 379, 396 (4th Cir. 2014) (quoting *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

To determine whether a defendant is entitled to qualified immunity, the Court must follow the two-step procedure articulated in *Saucier v. Katz*.[2] *See* 533 U.S. 194, 201 (2001). First, the Court decides "whether a constitutional violation occurred." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). On a 12(b)(6) motion to dismiss, this means asking whether, "viewed in the light most favorable to the plaintiff," the allegations in the complaint "demonstrate a violation of the plaintiff's constitutional rights." *See Harris v. Pittman*, 927 F.3d 266, 270 (4th Cir. 2019). Second, the Court must examine "whether the right violated was clearly established"—that is, "sufficiently clear that every reasonable official would have understood" that his behavior violated the right at issue. *See Henry*, 652 F.3d at 531; *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016). This standard does "not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Rather, "[w]hat matters is that it would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted." *Livingston v. Kehagias*, __ F. App'x __, 2020 WL 898092, at *10 (4th Cir. Feb. 25, 2020) (quotation omitted).

To overcome a qualified immunity defense, a plaintiff must prevail at both *Saucier* steps. *See* 533 U.S. at 201. The Officers contend that Plaintiffs have failed to satisfy either prong. (*See* ECF No. 26 at 7–19.) Before evaluating their arguments, however, the Court must answer

---

[2] The Court has discretion to address each prong in the order "that will best facilitate the fair and efficient disposition of each case." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

a more foundational question raised in the briefs: what, exactly, is the "right" alleged to have been violated?

According to the Officers, Plaintiffs have alleged the violation of "a purported right to not be restrained with a hobble." (*Id.* at 9.) A fair reading of the complaint, however, reveals that this view is too narrow. The Fourth Amendment does not prohibit the use of restraints outright, nor restraint by any particular mechanism. Rather, it bars police from restraining an individual in a manner which is unnecessary, gratuitous, or disproportionate given the circumstances. *See Meyers*, 713 F.3d at 734–35. It is this familiar right—to be free from the use of "excessive force" when being seized—which is the focus of the instant complaint. (*See, e.g.*, ECF No. 1 ¶¶ 43, 54–56, 69, 75.) Thus, at step one of the *Saucier* analysis, the proper inquiry is not whether the use of a hobble is *ever* appropriate, but, rather, whether its use *in this particular case* was so disproportionate to the needs of the moment that it amounted to a Fourth Amendment violation.

### i. Constitutional Violation

In evaluating whether an officer's use of force is excessive, courts apply a "standard of objective reasonableness." *Harris*, 927 F.3d at 272 (quoting *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002)). Though the standard defies "precise definition or mechanical application," the three factors outlined in *Graham v. Connor*—"[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"—can provide a useful framework for evaluating whether an officer's actions were objectively reasonable. *See* 490 U.S. 386, 396 (1989)). However, as the Officers note, *Graham* is somewhat

ill-suited to the task at hand. (*See* ECF No. 26 at 13–14.) In the words of the complaint, "[Smith] presented a purely medical and mental health problem, not a law enforcement problem," (ECF No. 1 ¶ 53); yet two of the three *Graham* factors speak expressly to the use of force in a criminal, rather than medical, context. Recognizing this poor fit under similar facts, the Sixth Circuit in *Estate of Hill v. Miracle* "suggest[ed] that a more tailored set of factors be considered in the medical-emergency context," including whether the person experiencing the emergency could think clearly, whether the person posed an immediate threat of serious harm to himself or others, and, if so, whether some degree of force was necessary to ameliorate that threat. *See* 853 F.3d 306, 314 (6th Cir. 2017). Keeping in mind the ultimate goal of resolving "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them," *see Graham*, 490 U.S. at 397, this Court sees no harm in likewise tailoring its considerations—especially since applying both the *Graham* and *Miracle* factors at this stage yields the same result.

Accepting the complaint's factual allegations as true, the three *Graham* factors weigh heavily in Plaintiffs' favor. First, the "severity" of any purported crime was low. As discussed above, the allegations portray the incident as primarily a medical emergency—the complaint's only reference to criminal behavior is a citation to Smith's autopsy report, which lists two illicit drugs, "n-ethylpentalone [and] cocaine," as among the causes of death. (ECF No. 1 ¶ 52); *see also Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) ("Even in a case in which the plaintiff had committed a crime, when the offense was a minor one, . . . the first *Graham* factor weighed in [the] plaintiff's favor . . . ." (quotation omitted)). Second, while Plaintiffs allege that Smith was "agitated, afraid, and in the throes of a mental health crisis," (ECF No. 1 ¶ 26), the

complaint does not readily support an inference that Smith "pose[d] an immediate threat to the safety of the officers or others," *Graham*, 490 U.S. at 396. To be sure, Smith is depicted as "panic[ked]" at times—even going so far as to "bang[ ] his hand against the window" of the patrol car. (ECF No. 1 ¶¶ 29–30). However, the complaint repeatedly states that Smith was unarmed, nonviolent, and nonthreatening, such that the cadre of eight Officers had no trouble restraining him. (*See, e.g.*, *id.* ¶¶ 27, 36, 53.) Third, although Smith was "grunting and groaning and moving his body" as the Officers applied the hobble, he nonetheless "was not actively resisting the Defendants" or attempting to flee. (*See id.* ¶¶ 27, 38.) Thus, under the *Graham* framework, Plaintiffs have plausibly alleged that the Officers' behavior was objectively unreasonable under the circumstances.

What the *Graham* analysis fails to capture, however, is the urgency of Smith's medical need, and the potential that some force would become necessary in light of that need. When the Officers encountered Smith, he "begged" them for help, "repeatedly [asking] to be taken to the hospital." (*Id.* ¶ 24.) Smith was behaving irrationally—"running around in circles" in the street—such that the Officers "believed [he] was under the influence of drugs." (*Id.* ¶¶ 24–25.) After calling an ambulance, the Officers initially held Smith in the back of one of their police cars. (*Id.* ¶ 28–29.) However, within "a short period of time," Smith began to "thrash around" and bang on the window. (*Id.* ¶ 29–30.) Under these facts, it is difficult to see how the Officers could have safely transported Smith to the hospital without employing some form of restraint; he may not have posed a threat to the Officers, but he appeared "incapable of making a rational decision under [the] circumstances," and, given his erratic behavior, may

have "posed an immediate threat of serious harm to *himself*." *See Miracle*, 853 F.3d at 314 (emphasis added).

Plaintiffs do not directly dispute the idea that some measure of restraint may have been warranted under the circumstances. Nonetheless, they maintain that the *manner* in which Smith was restrained—holding him prone on the ground, "bending his knees . . . until his feet were touching his handcuffed hands at the small of his back," while "tightening the [hobble] so tight" that he asphyxiated—was excessive. (*See* ECF No. 40 at 10.) Viewing the allegations in the light most favorable to Plaintiffs, the Court agrees. As alleged, the Officers easily forced Smith to the ground, handcuffed him, bound his ankles, and affixed his hands to his feet using the hobble. (*See* ECF No. 1 ¶¶ 37–41.) Rather than stop there, however, the Officers "continued to violently push [Smith]'s feet toward his back," as he "wheez[ed], moan[ed], groan[ed], [and] gasp[ed] for air." (*Id.* ¶ 41, 44.) It is plausible that this behavior was unreasonable; even if some use of a restraint was warranted under the circumstances, there was no need to ratchet up the tension on the hobble once Smith—who was not actively resisting in the first place—had been clearly subdued. Thus, even under an analysis more appropriately tailored to the medical-emergency context, Plaintiffs have plausibly alleged that the Officers' violated Smith's right to be free from excessive force.

### ii.    *Clearly Established Right*

Moving on to the second step of the *Saucier* analysis, the Court must assess whether "pre-existing law ma[de] the unlawfulness of the conduct in question"—again, as alleged by Plaintiffs and drawing all reasonable inferences in their favor—"apparent." *See Harris*, 927 F.3d at 281 (quotation omitted). To determine whether a reasonable officer would have

known that his conduct was unlawful in a given situation, the Court typically "need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose." *See Wilson v. Kittoe*, 337 F.3d 392, 402–03 (4th Cir. 2003). However, when the "unlawfulness" of conduct would be "apparent" to any reasonable person, a right may still be recognized as "clearly established" even when there is no existing precedent directly on point. *Clem*, 284 F.3d at 553 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Courts must be nevertheless careful "not to define clearly established law at a high level of generality." *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). While "general statements of the law are not inherently incapable of giving fair and clear warning to officers," specificity is crucial in the Fourth Amendment context, as "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* at 1152–53 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Mullenix v. Luna*, 136 S. Ct. 305, 308–09 (2015)).

Given the somewhat atypical facts here, the Court cannot locate—and Plaintiffs have not provided—a Fourth Circuit case which is precisely on point. However, the "'exact conduct at issue need not' previously have been deemed unlawful for the law governing an officer's actions to be clearly established." *Sims v. Labowitz*, 885 F.3d 254, 262 (4th Cir. 2018) (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001)). That is because "[p]recedent involving *similar* facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force.'" *See Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 312) (emphasis added). With that principle in mind, the Court finds that a long line of

precedent supports Plaintiffs' contention that the Officers were on notice that their conduct was unlawful.

At the time the allegedly excessive force was deployed against Smith—ratchetting up the tension on the hobble well beyond what was necessary to subdue him—he was secured, unarmed, and nonresistant. (*See* ECF No. 1 ¶ 39, 53.) As numerous reported cases in this circuit confirm, it is clearly established that the use of "unnecessary, gratuitous, and disproportionate force" against an incapacitated citizen who poses no active threat violates the Fourth Amendment. *See, e.g.*, *Meyers*, 713 F.3d at 734; *Yates*, 817 F.3d at 886–87. For example, in *Jones v. Buchanan*, the Fourth Circuit denied qualified immunity to an officer who "severely injured [a plaintiff] by knocking him to the floor and jumping on him" when the plaintiff was "unarmed, handcuffed, and alone in a secured room." 325 F.3d at 532. Likewise, in *Bailey v. Kennedy*, the court held that officers were not entitled to lift a plaintiff up and kick him in the back once the plaintiff had been "secured face down on the floor in handcuffs and leg restraints." 349 F.3d 731, 745 (4th Cir. 2003). More recently, in *Meyers v. Baltimore County*, the court considered a series of ten taser strikes—three occurred when the plaintiff "posed an immediate threat to the officers' safety, and was actively resisting arrest," whereas the remaining seven came after the plaintiff had been subdued and "several officers sat on [his] back." *See* 713 F.3d at 733–34. In concluding that the first three uses of the taser were reasonable, but the subsequent seven were not, the court reaffirmed that officers "act in an objectively [un]reasonable manner" when they use unnecessary force against "an individual who no longer is armed, has been brought to the ground, has been restrained physically by

several other officers, and no longer is actively resisting arrest." *See id.* at 734. That is what Plaintiffs allege occurred here.

Defendants argue that the use of a hobble in this case, as opposed to some more familiar weapon or device, meaningfully distinguishes it from the precedent cited above. (*See* ECF No. 50 at 5–6 (contending that "a hobble restraint cannot be analogized to a weapon" or the use of "targeted force").) However, the Fourth Circuit has made it clear that the use of gratuitous force against an unarmed and secured individual is unconstitutional "whether arising from a gun, a baton, a taser, *or other weapon.*" *Meyers*, 713 F.3d at 734–35 (emphasis added). As alleged in the complaint, the Officers did more than use the hobble to restrain Smith; they "violently push[ed] [his] feet toward his back" and "tightened the strap . . . so tight" that he could no longer breathe. (*See* ECF No. 1 ¶¶ 41–45.) The fact that force was exerted through the hobble, rather than a more conventional mechanism, is simply "not dispositive." *Meyers*, 713 F.3d at 734–35; *cf. McCue v. City of Bangor*, 838 F.3d 55, 64–65 (1st Cir. 2016) (concluding that, in light of holdings from at least four other circuits, "it was clearly established [by 2012] that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued" constitutes excessive force (quotation omitted)).

In sum, Plaintiffs have plausibly alleged that the Officers violated Smith's clearly established constitutional right to be free from excessive force. At the time of the incident, it was well established that "serious physical force. . . is constitutionally excessive when used against an individual suspected, at most, of a minor crime, who is unarmed, and who does not attempt to flee or physically attack the officer." *Livingston*, 2020 WL 898092, at *8 (citing

Fourth Circuit precedent dating back to 1994).  Accordingly, the Officers have not demonstrated that they are entitled to qualified immunity at this stage of the litigation.

## 2.  State Law Wrongful Death – N.C. Gen. Stat. § 28A-18-2

The Officers' arguments against Plaintiffs' state law wrongful death claim fare no better.[3]  In North Carolina, public officials "engaged in the performance of governmental duties involving the exercise of judgment and discretion" enjoy immunity from personal liability.[4]  *Meyer v. Walls*, 489 S.E.2d 880, 888 (N.C. 1997) (quoting *Smith v. Hefner*, 68 S.E.2d 783, 787 (N.C. 1952)).  However, public official immunity may be pierced if it is proven that an officer's conduct was "corrupt or malicious" or "outside of and beyond the scope of his duties."  *See id.* (quoting *Hefner*, 68 SE.2d at 787).

The Officers contend that they are entitled to public official immunity because "[t]here are no allegations that [they] were acting outside the scope of their . . . authority" or "that [their] actions were malicious."  (ECF No. 26 at 21–22.)  However, as the above discussion of qualified immunity makes clear, Plaintiffs have plausibly alleged that the Officers violated Smith's clearly established right to be free from excessive force.  That the complaint does not

---

[3] Count 6 of the complaint alleges that Smith's death "was proximately caused by the wrongful acts, negligence, neglect, default and/or willful and wanton conduct of the individual Defendants."  (ECF No. 1 ¶ 96.)  In their briefs, the parties address the issue of whether Smith's alleged drug use—cited as a cause of death in the autopsy report, (*see id.* ¶ 52; ECF No. 23-2 at 2)—amounts to contributory negligence on his part.  (See ECF Nos. 26 at 23–24; 40 at 19–20; 50 at 12–13.)  However, the Court agrees with the Officers that, as it pertains to them specifically, Plaintiffs' state law wrongful death claim appears to be based on intentional conduct, rather than mere negligence.  (ECF Nos. 40 at 20; 50 at 12.)  Thus, the Court need not discuss the availability of contributory negligence as a defense to Count 6.  *See Jenkins v. N.C. Dep't of Motor Vehicles*, 94 S.E.2d 577, 581 (N.C. 1956) ("Contributory negligence is no defense to an intentional tort.").

[4] "It is well settled that police officers are public officials."  *Chastain v. Arndt*, 800 S.E.2d 68, 75 (N.C. Ct. App. 2017).

use the specific word "malice" is of no consequence, because "[a]n officer acts with malice when he 'does that which [an officer] of reasonable intelligence would know to be contrary to his duty.'" *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (quoting *Bailey*, 349 F.3d at 742). In other words, public official immunity "is unavailable to officers who violate clearly established rights," and it is unavailable to the Officers here. *See Bailey*, 349 F.3d at 742.

### c. Greensboro's Motion to Dismiss

In addition to suing the Officers in their individual capacities, Plaintiffs bring claims directly against the City of Greensboro. Once again, several claims must be dismissed at the outset. To the extent the complaint's state law claims—Counts 6 through 8—were directed at Greensboro, Plaintiffs now concede that those claims are barred by governmental immunity. (*See* ECF Nos. 23 at 23–25; 24; 31 at 19.) Further, as with the Officers, Count 3 against Greensboro—deprivation of a purported Fourteenth Amendment right to familial relationships—does not state a cognizable claim in the Fourth Circuit. (*See* ECF Nos. 40 at 18; 43 at 2); *supra* at III.b.

Consequently, four counts remain against Greensboro. However, the four remaining counts really comprise just two distinct claims. The § 1983 claims—Counts 1, 2, and 4—essentially allege that, in addition to the Officers, Greensboro itself bears some responsibility for the violation of Smith's constitutional rights. Thus, for the purposes of Greensboro's motion to dismiss, the Court will consider those counts in tandem. The final claim against Greensboro—Count 5—alleges an ADA violation and will be considered separately.

1. <u>Municipal Liability / § 1983 Claims</u>

As a general rule, municipal liability under § 1983 "is limited to action for which the municipality is actually responsible." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). In other words, "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997). Rather, in order to be held liable, the municipality *itself* must have generated the "moving force" behind the alleged constitutional violation, either through official policy or widespread and pervasive custom. *See City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

In *Lytle v. Doyle*, the Fourth Circuit helpfully explained that "[a] policy or custom for which a municipality may be held liable can arise in four ways":

(1)      through an express policy, such as a written ordinance or regulation;

(2)      through the decisions of a person with final policymaking authority;

(3)      through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or

(4)      through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*See* 326 F.3d 463, 471 (4th Cir. 2003) (citing *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)) (quotations omitted). Greensboro contends that the complaint fails to properly allege municipal liability under any of these theories. (*See* ECF No. 23 at 7–17.)

i.   *Express Policy*

Plaintiffs reference a single written policy in their complaint: Greensboro Police Department Directive 11.1.4, *Handling and Transporting of Persons in Custody – Restraint* ("the Directive"). (ECF No. 1 ¶¶ 58–59.) Pursuant to the Directive, Greensboro officers are

prohibited from linking "the wrists and ankles of an arrestee . . . together using [a hobble], unless the arrestee can be seated in an upright position, or on their side." (*Id.* ¶ 58.) Further, if a hobble *is* applied, "the knees of the arrestee will not be bent more than 90 degrees (unless extenuating circumstances exist)," so as "to prevent stress being placed on the arrestee's chest muscles or diaphragm which might contribute to a positional asphyxia situation." (*Id.*)

On its face, nothing in the Directive sanctions unconstitutional behavior. Nor have Plaintiffs alleged as much in their complaint. To the contrary, the Directive recognizes that asphyxiation from the improper use of a hobble is a risk, and commands that officers refrain from exactly the kind of dangerous behavior alleged in this case.

In their response brief, Plaintiffs suggest that the Directive's "extenuating circumstances" language supports the inference that the Greensboro Police Department somehow encouraged its officers to use life-threatening force. (*See* ECF No. 31 at 9.) Without the support of substantive factual allegations in the complaint, however, the notion that the Directive—which instructs officers on the safe use of a hobble—was meant to be understood as a license to use a hobble in an *un*safe manner, is implausible. In short, Plaintiffs have not sufficiently pleaded municipal liability under an express-policy theory.

### ii.   *Final Policymaker*

Even absent an express written policy, the decisions of a final policymaker can still lead to municipal liability. *See Pembaur*, 475 U.S. at 480–81. Importantly, "not every decision by every municipal official will subject a municipality to section 1983 liability." *See Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). "Rather, 'municipal liability attaches only where the decisionmaker possesses *final* authority to establish municipal policy with respect to

the action ordered.'" *Id.* (quoting *Pembaur*, 475 U.S. at 481) (emphasis added). That is because only final policy makers' "edicts or acts may fairly be said to represent official policy." *See id.* (quoting *Monell*, 436 U.S. at 694).

In a section titled "Policy and Practice Allegations," the complaint alleges that "Greensboro[,] its Police Department, and their decision makers, including Greensboro Police Chief Wayne Scott . . . encourage[ed] and/or authoriz[ed]" the use of hobble restraints "without regard to whether a person was a criminal suspect, or was particularly vulnerable to the potential lethal consequences of hogtying." (ECF No. 1 ¶ 62.) However, in their response brief, Plaintiffs seem to disclaim the possibility that these allegations were meant to support a final-policymaker theory of municipal liability. (*See* ECF No. 31 at 14 n.5 ("The City mistakenly reads Plaintiffs' Complaint to assert an additional theory of municipal liability that is premised on its final decision maker's participation in, or decision to, hogtie Marcus Smith.").) Then—adding to the confusion—Plaintiffs argue (1) that Chief Scott was "the most obvious and likely" official in possession of final policymaking authority relevant to this case, but (2) that "[r]esolution of this issue at this early stage in the proceedings is unnecessary." (*See id.*)

Ultimately, there is no need to parse Plaintiffs' inconsistent statements; their "formulaic recitation" of terms like 'decisionmaker' and 'policy' do not camouflage the fact that no specific, affirmative policy decisions—by Chief Scott or any other named official—are alleged anywhere in the complaint. *See Mallatere v. Town of Boone*, No. 5:18-CV-00006-GCM, 2019 WL 2366461, at *3 (W.D.N.C. June 3, 2019). Accordingly, the Court finds that Plaintiffs have

failed to plead facts with the requisite specificity to support municipal liability under a final-policymaker theory.

### iii. Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Allegations of mere negligence are insufficient; "only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact" does municipal liability arise. *City of Canton*, 489 U.S. at 388 (emphasis added); *see also Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Further, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390–91. Instead, a plaintiff must allege facts demonstrating that the failure to train "was the result of an affirmative, conscious decision" made with indifference towards a "plainly obvious" potential for constitutional injury. *See Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 390 n.10).

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a deliberate or conscious choice by the municipality, and (3) that the officer's conduct resulted from said training." *See, e.g.*, *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014) (quotations omitted); *Cobbs ex rel. Cobbs v. Cty. of Guilford*, No. 1:10CV806, 2012 WL 3113141, at *4 (M.D.N.C. July 31, 2012), *adopted as modified*, 2012 WL 4508106 (M.D.N.C. Sept. 28, 2012).

As to the first factor, Plaintiffs have alleged, with appropriate specificity, certain deficiencies in the way Greensboro trains its officers to use hobble restraints. (*See* ECF No. 1 ¶ 62.) For example, the complaint alleges that Greensboro failed to train its officers "as to whether, under what circumstances, and/or how to use hogtie restraint devices to bind a subject's arms and feet together behind his back," (*id.* ¶ 62(a)); "in the dangers of use of hogtie restraint devices, especially for people . . . whose physical and mental state make them particularly vulnerable to the lethal effects of hogtie restraint devices," (*id.* ¶ 62(e)); and "in the proper way to contain, treat and secure people like [Smith] who . . . may be in an irrational and/or delusional and/or agitated state because of a mental health crisis," (*id.* ¶ 62(f)). These allegations properly describe "the nature of the training" which Plaintiffs claim is inadequate. *See Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *6 (D. Md. Sept. 18, 2017).

The second factor—whether the training represents a deliberate or conscious choice by the municipality, made with indifference to the rights of its citizens—likewise finds support in the complaint's factual allegations. Deliberate indifference is a "stringent standard of fault, requiring proof that a [municipality] disregarded a known or obvious consequence of [its] action." *Connick*, 563 U.S. at 61 (quoting *Bryan Cty.*, 520 U.S. at 410). While "prevailing on the merits of a *Monell* claim is difficult," however, "simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403. Here, Plaintiffs have alleged that Greensboro was aware that the improper use of a hobble restraint could result in severe injury. The Directive acknowledges that placing undue stress on an arrestee's chest and diaphragm can "contribute to positional asphyxia." (ECF No. 1 ¶ 58.) Further, the manufacturer's warning accompanying RIPP Hobbles allegedly contains the admonition "NEVER Hog-Tie a Prisoner," the inference

being that hogtying is dangerous. (*Id.* ¶ 60.) Thus, it is at least plausible that Greensboro understood that, without appropriate training, its officers in the field would use hobble restraints in a manner which violated citizens' rights to be free from excessive force.

The third factor—causation—is also satisfied. For inadequate training to have "caused the violation" at issue, there must at least be an "affirmative link" between the two, such that "occurrence of the specific violation [becomes a] reasonable probability rather than a mere possibility." *See Spell v. McDaniel*, 824 F.2d 1380, 1387–88, 1390 (4th Cir. 1987). Greensboro argues that Plaintiffs have not alleged a sufficient link between the highlighted training deficiencies and the violation of Smith's constitutional rights. (ECF No. 23 at 13.) However, as explained above, the complaint alleges that Greensboro fails to train its officers on how to safely restrain people who, like Smith, are in the "throes of a mental health crisis." (*See* ECF No. 1 ¶¶ 26, 62.) Therefore, Plaintiffs have plausibly alleged an "affirmative link" between the violation of Smith's rights and the inadequacy of the training provided: that while Greensboro officers are equipped with hobbles, in the absence of proper training, there is a "reasonable probability" that they will use those hobbles in an excessive fashion.

In sum, the complaint contains factual allegations supporting each element of a failure-to-train claim. "Prevailing under such a theory [will be] no easy task," given the rigorous standards of fault involved. *Owens*, 767 F.3d at 402. However, at this early stage in the litigation, "courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional [omission] and the responsible policymakers." *Johnson v. Balt. Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) (collecting cases). Accordingly, the Court concludes that Plaintiffs have sufficiently pleaded a *Monell* claim against

Greensboro for failing to train its officers with respect to the improper use of hobble restraints.

The final way in which municipal liability may arise is through "a practice [which]," despite having no formal authorization, "is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Lytle*, 326 F.3d at 473 (citing *Carter*, 164 F.3d at 218). To succeed under this theory, a plaintiff must show (1) that the municipality had "actual or constructive knowledge of the custom and usage," and (2) that, either with "specific intent or deliberate indifference," its policymakers failed to "correct or terminate the improper custom and usage." *See Randall v. Prince George's Cty.*, 302 F.3d 188, 210 (4th Cir. 2002) (quotations omitted). Constructive knowledge of such a custom "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *See Spell*, 824 F.3d at 1391.

Unlike their failure-to-train allegations, which are sufficiently specific and relevant, Plaintiffs' few custom-or-practice allegations are too generalized and disconnected from the violation at issue to give rise to municipal liability. The complaint states that "Greensboro and its Police Department have a long history of racist police violence and misconduct," "condone[d] and ratif[ied]" by city officials, which has led city police officers "to believe that they can abuse African American citizens with impunity and with no fear of consequences." (ECF No. 1 ¶ 63.) Even if true, the complaint fails to draw a connection between those allegations and a widespread practice of using restraints in an excessive or gratuitous way.

Because allegations that "past generalized bad police behavior led to future generalized bad police behavior" are too "nebulous" to satisfy the "rigorous standards of culpability and causation" required by § 1983, the Court cannot conclude that Plaintiffs have plausibly alleged liability under a custom-or-practice theory. *See Carter*, 164 F.3d at 219 (quoting *Bryan Cty.*, 520 U.S. at 405).

For the foregoing reasons, the Court will therefore deny Greensboro's motion to dismiss the § 1983 claims against it. While Plaintiffs have failed to properly allege municipal liability under either an express-policy, final-policymaker, or custom-or-practice theory, they have plausibly alleged liability based on a failure to train.

2. ADA Claim

In Count 5, Plaintiffs allege that Greensboro violated Title II of the ADA by failing to reasonably accommodate Smith's mental health disability during his encounter with the Officers. (ECF No. 1 ¶¶ 85–91.) Title II provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any [public] entity." 42 U.S.C. § 12132. "Discrimination" under the statute includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A), and the Fourth Circuit has recognized that police may so discriminate in the course of a seizure or arrest. *See Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (acknowledging that an officer can discriminate by "fail[ing] to reasonably accommodate [a] disability during [an] investigation or arrest," in turn causing a qualified individual "to suffer greater injury or indignity" than another in his position would).

As is relevant here, the text of Title II contains an important limitation on public-entity liability: a knowledge requirement. The duty to provide reasonable accommodation only arises when the public entity is aware of a "*known* physical or mental limitation," and the need for an accommodation is or should be clear. *See* 42 U.S.C. 12112(b)(5)(A); *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1196–97 (10th Cir. 2007) ("Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation.").

In seeking to dismiss Plaintiffs' ADA claim, Greensboro argues that the Officers lacked sufficient knowledge of both Smith's mental-health disability and the need for an accommodation. (*See* ECF No. 23 at 19–22). The complaint does state that Smith "had been diagnosed with bipolar disorder and schizophrenia." (ECF No. 1 ¶ 22). However, there are no allegations that the Officers were made aware of this specific medical history, either before or during their interactions with Smith. Nonetheless, the complaint alleges that it was clear to the Officers that Smith was "in the throes of a mental health crisis" and that they were "aware of [Smith's] mental state and vulnerability." (*See id.* ¶¶ 26, 54.) Thus, it is at least plausible that the Officers recognized Smith as mentally disabled, even if the precise nature of his disability was uncertain.

What is far less clear, however, is whether the Officers should have perceived a need for special accommodation aside from the usual, lawful treatment afforded to any agitated, intoxicated, or distressed person requiring medical attention. Knowledge of the need for an accommodation can either "derive from an individual's request for an accommodation" or

arise because the need is "obvious." *Robertson*, 500 F.3d at 1197. For example, the need for some accommodation might be readily "known" where a paraplegic arrestee is transported in a police van without a wheelchair restraint, *see Gorman v. Bartch*, 152 F.3d 907, 909–10 (8th Cir. 1998), or where officers are attempting to question a deaf person during an investigation, *see Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 340 (4th Cir. 2012). Here, however, the complaint is devoid of any facts indicating that Smith asked for an accommodation—his only request was to be taken to the hospital—or that the need to treat him differently than a nondisabled person was plain.

In their response brief, Plaintiffs argue for the first time that the Officers "could have reasonably accommodated [Smith's] disability by continuing to maintain distance, communicating with him[,] de-escalating the situation," and, "[t]o the extent force was necessary to restrain him for transport," using "less aggressive tactics." (*See* ECF No. 31 at 17–18.) The factual material *in the complaint*, however, does not "allow for the inference" that such accommodations were obviously needed because of Smith's disability, as Plaintiffs contend. (*See id.* at 17); *see also Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019) (holding that plaintiff could not prevail under an "accommodation" theory when defendant officer "had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances"). Instead, as discussed above, the complaint alleges that the Officers' use of force in restraining Smith was objectively unreasonable—not because the Officers failed to recognize the need for an accommodation based on a known disability, but because they deployed excessive force against Smith when he was already restrained and nonthreatening. In short, the complaint does not contain sufficient factual allegations to support the knowledge

component of a Title II reasonable accommodations claim. Accordingly, Count 5 will be dismissed.

### d. The Paramedics' Motion to Dismiss

With respect to its claims against the Paramedics, the complaint is less than a model of clarity. It can be difficult, in places, to discern whether certain claims directed at "Defendants" generally are meant to include allegations against just the Officers, just the Paramedics, or both. Nevertheless, when the various counts are read against the backdrop of the complaint's factual allegations, three potential claims against the Paramedics emerge.[5] First, Counts 1 and 2 can be read to assert that the Paramedics violated Smith's Fourth Amendment rights by acting in concert with the Officers. (*See* ECF No. 1 ¶ 68–77.) Second, the same two Counts contain allegations that the Paramedics violated Smith's due process rights under the Fourteenth Amendment by failing to provide him with prompt medical care. (*See id.*) Last, Count 6 alleges a wrongful death claim, which, as applied to the paramedics, sounds in medical malpractice under North Carolina law. (*See id.* ¶¶ 92–99.) The Paramedics seek to dismiss all claims.

#### 1. Fourth Amendment Conspiracy

In their briefing, Plaintiffs confirm that their "primary claim" against the Paramedics is that "they failed to provide [Smith] with prompt medical care in violation of his constitutional rights." (ECF No. 32 at 2.) The Fourth Amendment would be an unusual basis for this kind of claim, as § 1983 failure-to-treat actions typically arise under either the or Eighth or

---

[5] As with the Officers and Greensboro, to the extent Count 3 was directed at the Paramedics, Plaintiffs appear to concede that it does not state a cognizable claim in the Fourth Circuit. (*See* ECF Nos. 21 at 10; 40 at 18); *supra* at III.b.

Fourteenth Amendment. Nonetheless, Plaintiffs argue that a Fourth Amendment claim lies against the Paramedics because they acted in concert with the Officers to excessively "restrain and hogtie [Smith]." (*See id.* n.1). The only support for this theory in the complaint, however, comes in the form of a single, boilerplate phrase: "Defendants, *acting jointly and in conspiracy . . .* deprived [Smith] of [his] rights." (ECF No. 1 ¶ 69 (emphasis added).) To plead an even "plausible suggestion of conspiracy," a plaintiff must allege "facts that would reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *See Ruttenberg v. Jones*, 283 Fed. App'x 121, 132 (4th Cir. 2008). Yet the complaint contains nothing more than a "bare, conclusory allegation that the [Paramedics and Officers] conspired to violate" Smith's Fourth Amendment rights. *See id.* Accordingly, to the extent Plaintiffs attempt to allege a Fourth Amendment claim against the Paramedics, that claim must be dismissed.

### 2. Fourteenth Amendment Due Process

The Court next considers Plaintiffs' claim that the Paramedics' failure to "promptly attend to [Smith's] serious medical needs" violated Smith's right to due process under the Fourteenth Amendment. (*See* ECF Nos. 1 ¶ 69; 32 at 6–11.) The Paramedics argue that they are entitled to qualified immunity on this claim, (*see* ECF No. 21 at 3–13), so the Court undertakes the same two-step inquiry described above: asking first whether a constitutional violation occurred, and then, if so, whether the right at issue was clearly established.

"[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)) (internal

quotations omitted). "[O]nly the most egregious official conduct," however, gives rise to a due process violation—namely, that which "shocks the conscience." *See Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 at 846). Whether it can be said that certain conduct shocks the conscience is often a matter of circumstance, and "a lower level duty of culpability may amount to a substantive due process violation in those situations where the government is required to 'take care of those who have already been deprived of their liberty.'" *Id.* (quoting *Collins* 503 U.S. at 127). Thus, government actors "can shock the conscience for the purposes of finding a substantive due process violation" when they manifest a "*deliberate indifference* to the care of persons in [their] custody."[6] *Id.*

Outside of the custodial context, government conduct normally does not shock the conscience (at least not in the constitutional sense) unless it was "intended to injure in some way unjustifiable by any government interest"—a higher standard of fault than deliberate indifference. *See id.* (quoting *Lewis*, 523 at 849). As the complaint does not appear to contain

---

[6] In *Kingsley v. Hendrickson*, the Supreme Court held that "the appropriate standard for [assessing] a pretrial detainee's excessive force claim is solely an objective one." 135 S. Ct. 2466, 2473 (2015). That holding has sparked debate over whether an objective reasonableness standard should likewise apply in other custodial-context cases. *Compare, e.g., Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (extending objective standard to conditions-of-confinement claims) *and Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016) (en banc), *cert denied*, 137 S. Ct. 831 (2017) (same with respect to failure-to-protect claims), *with Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (continuing to "apply a subjective standard post-*Kingsley*" to pretrial detainees' claims other than for excessive force). The Fourth Circuit has not yet weighed in on this question. *See, e.g., Duff v. Potter*, 665 Fed. App'x 242, 244–45 (4th Cir. 2016) (assessing plaintiff's excessive force claim under *Kingsley*'s objective reasonableness standard, but declining to disturb, for procedural reasons, the district court's ruling on plaintiff's claim of deliberate indifference to a serious medical need). However, the Court need not resolve the issue here, because, as explained below, Plaintiffs have adequately pleaded a Fourteenth Amendment claim under the more demanding standard of subjective deliberate indifference.

any allegations of an actual intent to injure on the part of the Paramedics, Plaintiffs' Fourteenth Amendment claim hinges on whether or not Smith was "in custody." Moreover, given the facts of this case, whether Smith was in custody may determine whether the Fourteenth Amendment is implicated *at all*. That is because, barring exceptions for custody and state-created dangers, "[i]t is *not* a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need." *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (emphasis added) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)).

i.    *"Custody"*

The Paramedics argue that Smith was not "in custody," but, rather, was "temporarily held in place by law enforcement for apparent safety reasons." (*See* ECF No. 48 at 4.) Citing to the Fourth Circuit's opinion in *Pinder v. Johnson*, they contend that the only kind of "custody" which triggers an affirmative duty to provide medical care under the Due Process Clause is a "sustained level of confinement"—"incarceration, institutionalization, *or the like*"—and that the complaint "offers no allegation that [Smith's] liberty was deprived in such a manner." (*See id.* at 4–5 (quoting 54 F.3d 1169, 1175 (4th Cir. 1995)).) However, the Court does not read *Pinder* and related cases so narrowly. In the more recent case of *Slaughter v. Mayor and City Council of Baltimore*, the Fourth Circuit cited several examples of "those who have already been deprived of their liberty" for due process purposes: "pretrial detainees, persons in mental institutions, convicted felons, and persons under arrest." *See* 682 F.3d at 321. The common feature of that (non-exhaustive) list is that, in each instance, there has been some "restraint of personal liberty," not that the restraint lasted for any specified period of time. *See DeShaney*,

489 U.S. at 200. Thus, as the Sixth Circuit has explained—in a case cited favorably by the Paramedics, no less—"[t]he overarching prerequisite for custody is an affirmative act by the state that restrains the ability of an individual to act on his own behalf." *See Jackson*, 429 F.3d at 590.

Here, the complaint's allegations show that Smith's personal liberty was sufficiently restrained during the relevant time period to place him in "custody." Although he was not under arrest, (*see* ECF No. 1 ¶ 30), Smith lay prone on the ground, hands and feet tied together behind his back, with at least four officers and both paramedics surrounding him, (*see id.* ¶¶ 46–48). Simply put, Plaintiffs have sufficiently alleged that Smith was in "custody," as "an affirmative act by the state"—tackling him to the ground and restraining him with a hobble—completely extinguished his ability to "act on his own behalf." *See Jackson*, 429 at 590.

In a related argument, the Paramedics contend that, even if Smith was in "custody," they were under no affirmative duty to provide him with medical care because he was in *the Officer's* custody, not theirs. (*See* ECF No. 21 at 6.) The Court is not moved by this reasoning. According to the complaint, the Paramedics were the sole government medical team dispatched to aid Smith. (*See* ECF No. 1 ¶¶ 28, 33.) There may be some instances in which the jurisdictional differences between Guilford County and the City of Greensboro matter with respect to a duty to intervene. However, in this case, where it appears that the Officers themselves called upon the Paramedics to render medical care, any distinction between the two governmental employers becomes much less meaningful. *See e.g.*, *Ramirez v. City of Chi.*, 82 F. Supp. 2d 836, 839–40 (N.D. Ill. 1999) (rejecting the argument that fire department paramedics called to the scene had no duty to render medical aid to person in police

department custody as one of "breathtaking cynicism"). The pleadings sufficiently allege that Smith was in custody, and that the Paramedics were the government employees called upon to provide medical care during that time. That they worked for the county, rather than the city, is unimportant.

## ii. *Constitutional Violation*

Having determined that the custody exception has been sufficiently alleged here, the Court must now consider whether, as alleged in the complaint, the Paramedics exhibited deliberate indifference towards Smith's serious medical needs in violation of the Fourteenth Amendment. "Deliberate indifference is a very high standard," *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A plaintiff may establish deliberate indifference by showing that the medical treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience," or by demonstrating that the defendant medical provider "disregard[ed] a substantial risk of danger that [was] either known to the defendant or which would [have been] apparent to a reasonable person in the defendant's position." *Miltier v. Beorn*, 896 F.2d 848, 851–52 (4th Cir. 1990). However, allegations of mere negligence or medical malpractice will not suffice. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

Though it is a close question, the Court concludes that Plaintiffs have plausibly alleged deliberate indifference on the part of the Paramedics. According to the complaint, both Paramedics stood near Smith as he gasped for air. (*See* ECF No. 1 ¶¶ 44, 48.) Even after they "knew [Smith] was unconscious, unresponsive[,] and not breathing," the Paramedics waited

more than two minutes before trying to resuscitate him.  (*Id.* ¶ 51.)  Any medical professional

in the Paramedics' position should have appreciated the urgency of the situation; with Smith

not breathing, time was of the essence.  *See generally Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th

Cir. 2005) ("A delay in care for known unconsciousness brought on by asphyxiation is

especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes.").

However, as Smith lay there, the Paramedics sat idly by.  Viewed in the light most favorable

to Plaintiffs, these facts plausibly support the allegation that the Paramedics disregarded a

substantial risk of danger to Smith by delaying their resuscitative efforts for more than two

minutes after learning that he was unconscious and not breathing.

### iii.  *Clearly Established Right*

The Paramedics contend that, even if their failure to provide timely aid violated Smith's

rights, they are still entitled to qualified immunity because it was not clearly established at the

time of the incident that their behavior ran contrary to the Fourteenth Amendment.  (*See* ECF

No. 48 at 10–12.)  Once again, Plaintiffs have not identified, nor has the Court been able to

locate, a Fourth Circuit case with facts directly on point.  However, that does not mean that it

would not have been "apparent" to the Paramedics that their behavior was unlawful.  The

general standard governing liability for the failure to provide medical care in the custodial

context—deliberate indifference—has been established for decades.  *See City of Revere v. Mass.

Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("The Due Process Clause . . . require[s] the responsible

government or governmental agency to provide medical care to persons . . . who have been

injured while being apprehended by the police."); *Estelle*, 429 U.S. at 106 (explaining that, "[i]n

order to state a cognizable claim, a [person in custody] must allege acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs"). Over time, a wide array of cases have applied the deliberate indifference standard to facts similar to those here. *See Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (explaining that, in the absence of Fourth Circuit precedent, courts "may look to a consensus of cases of persuasive authority from other jurisdictions" when determining if a right was clearly established). For example, in *Estate of Booker v. Gomez*, the Tenth Circuit denied qualified immunity to officers who waited three minutes to seek medical attention for a detainee who was rendered "limp and unconscious" by their use of force. *See* 745 F.3d 405, 434 (10th Cir. 2014). Likewise, in *Bozeman v. Orum*, the Eleventh Circuit held that officers acted with deliberate indifference when they waited fourteen minutes to call for medical assistance after learning that an inmate was unconscious and not breathing. *See* 422 F.3d at 1273. What these cases and others make clear is that governmental officials responsible for the medical care of a person in their custody may act with deliberate indifference when they (a) recognize that the person is unconscious or not breathing, but (b) allow critical minutes to pass before seeking or rendering aid. *See also, e.g.*, *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (denying qualified immunity where an officer "made no attempt to resuscitate" a prisoner who was not breathing "for seven minutes before paramedics arrive[d]"); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) (concluding that arresting officer's six-minute delay in seeking medical attention for asphyxiated arrestee supported a finding of deliberate indifference).

In light of the foregoing, it would have been sufficiently clear to government medical personnel in the Paramedics' position that delaying efforts to resuscitate Smith—for more than two minutes after recognizing that he was unconscious and not breathing—could amount

to deliberate indifference to a serious medical need. Accordingly, the Paramedics have not established that they are entitled to qualified immunity at this stage of the litigation.

### 3. State Law Wrongful Death – Rule 9(j) Violation

As it pertains to the Paramedics, Plaintiffs' state law wrongful death claim sounds in medical malpractice. *See* N.C. Gen. Stat. § 90-21.11(2)(a) (defining a medical malpractice action as "[a] civil action for damages for personal injury or death arising out of the . . . failure to furnish professional services in the performance of medical . . . care"). Pursuant to North Carolina Rule of Civil Procedure 9(j), a complaint alleging medical malpractice must include a certification that the allegations of inadequate treatment and related records have been reviewed by an expert witness "who is willing to testify that the medical care did not comply with the applicable standard of care." *See* N.C. R. Civ. P. 9(j). Per the language of the Rule, a complaint which fails to adhere to this procedure "shall be dismissed." *See id.*; *Norton v. Scotland Mem'l Hosp., Inc.*, 793 S.E.2d 703, 707 (N.C. Ct. App. 2016) ("Rule 9(j) unambiguously requires a trial court to dismiss a complaint if the complaint's allegations do not facially comply with the rule's heightened pleading requirements.").

Though procedural in nature, Rule 9(j) applies to state law medical malpractice claims filed in federal court. *See, e.g.*, *Littlepaige v. United States*, 528 F. App'x 289, 292–93 (4th Cir. 2013) (construing Rule 9(j) as imposing a substantive requirement of state law); *Graves v. Andrews*, No. 1:12CV154, 2013 WL 1010473, at *8 (M.D.N.C. 2013) ("Failure to comply with Rule 9(j) is ground for dismissal of a state law medical malpractice claim filed in federal court." (citation omitted)). As the Paramedics correctly point out, Plaintiffs failed to include the requisite 9(j) certification in their complaint. (*See* ECF No. 21 at 13.) In an effort to remedy

this deficiency, Plaintiffs now seek leave to amend the complaint by adding (1) an expert's certification; and (2) additional factual allegations, limited to the wrongful death claim, which describe the Paramedics' efforts to treat Smith once he was on the ambulance. (*See* ECF Nos. 35; 35-1 ¶¶ 51, 57.) For the following reasons, Plaintiffs' motion for leave to amend, (ECF No. 35), will be denied as futile, and their wrongful death claim against the Paramedics will be dismissed.

In the recent case of *Vaughan v. Mashburn*, the North Carolina Supreme Court considered whether a medical malpractice plaintiff may amend a complaint to cure a Rule 9(j) violation. *See* 817 S.E.2d 370 (N.C. 2018). There, the plaintiff had a 9(j) expert review her claim before timely filing her complaint. *See id.* at 372. However, she mistakenly included the certification language from a prior version of 9(j) in the complaint, thereby "omitt[ing] an assertion," as required by the Rule, "that 'all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry'" had been reviewed by her expert. *See id.* at 372 (quoting N.C. R. Civ. P. 9(j)). When the defendant moved to dismiss, the plaintiff sought leave to amend her complaint, pursuant to Rule 15(a) of the North Carolina Rules of Civil Procedure, to include the necessary language. *See id.* at 372–73. By that time, however, the statute of limitations had run on her claim. *See id* at 373. The trial court denied leave to amend and dismissed the claim. *Id.*

When the case reached the North Carolina Supreme Court, the issue was one of resolving tension between two procedural rules: how best to reconcile the stringent pleading requirements for malpractice claims outlined in Rule 9(j) with the traditionally "liberal amendment process" provided for under Rule 15(a)? *Id.* at 374. The solution, at least on the

facts before the court, was to acknowledge that, by seeking expert review *before filing her complaint*, the plaintiff had adhered to "the letter and spirit of Rule 9(j)"—even though she had failed to comply with the Rule's technical strictures. *Id.* at 371. As the court explained, "[t]he legislature's intent [in adopting Rule 9(j)] was to provide a more specialized and stringent procedure for plaintiffs in medical malpractice claims [by requiring] expert certification *prior to* the filing of a complaint." *Id.* at 377 (emphasis added) (quoting *Thigpen v. Ngo*, 558 S.E.2d 162, 166 (N.C. 2002)). The idea was to create a gatekeeping function which would "weed[ ] out law suits which are not meritorious before they are filed." *See id.* at 379 (quotation omitted). Dismissing an amended complaint like the one in *Vaughan*, however, would not serve that purpose; by obtaining expert review before filing, the plaintiff had, in fact, ensured that her complaint was not frivolous. *See id.* at 379–80. Thus, the court saw fit to permit the plaintiff to amend the language of her complaint to reflect the substantive 9(j) steps she had already followed.

As it aimed to "harmonize" Rules 9(j) and 15(a), the *Vaughan* court remained careful to "emphasize that in a medical malpractice action the expert review required by Rule 9(j) must occur *before the filing of the original complaint*." *Id.* at 379 (emphasis added). As the court had previously explained, "[a]llowing a plaintiff to file a medical malpractice complaint and to then wait until after the filing to have the allegations reviewed by an expert would pervert the purpose of Rule 9(j)." *Thigpen*, 558 S.E.2d at 166–67. *Vaughan* reaffirmed that understanding, even while expanding the available opportunities to amend a complaint lacking the precise certification language required by Rule 9(j).

This clear requirement of obtaining expert review prior to the filing of the complaint proves fatal to Plaintiffs' malpractice claim against the Paramedics. Unlike the plaintiff in *Vaughan*, Plaintiffs here did not seek expert review before bringing their claim. In fact, Plaintiffs admit that they initially "did not believe that . . . Rule 9(j) certification . . . was . . . required." (ECF No. 35 ¶ 7.) It was only *after* the Paramedics raised the issue in their motion to dismiss that Plaintiffs "consult[ed] with an expert in compliance with Rule 9(j)." (*Id.* ¶ 8.) Plaintiffs do not dispute this timing in their briefing, nor do they allege earlier expert review in their proposed amended complaint. Thus, under *Vaughan* and related cases, Plaintiffs' proposed amendments would be futile because, even as amended, their malpractice claim still would not survive a Rule 12(b)(6) motion to dismiss for failure to follow Rule 9(j). *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (explaining that proposed amendment may be denied as futile when it "is clearly insufficient . . . on its face"). Dismissal may seem like a harsh result—especially given the fact that, assuming their proposed certification is truthful, Plaintiffs *did* ultimately get an expert to review and certify their malpractice claim as nonfrivolous. However, it is not this Court's place to sidestep or second-guess a clear requirement of state law.

### e. Guilford County's Motion to Dismiss

Finally, the Court considers the claims against the Paramedics' employer—Guilford County. Though several claims in the complaint appear to be directed at the county, Plaintiffs have confirmed through briefing that their "only claim against Defendant Guilford County is for *respondeat superior*." (ECF No. 32 at 2 n.2.) This clarification warrants dismissal of all claims against Guilford County because: (1) a county cannot be held liable under § 1983 on a theory

of *respondeat superior*, *see Monell* 436 U.S. at 691; and (2) as explained above, the remaining claim involving county employees—state law wrongful death—was improperly pleaded.

## IV.    CONCLUSION

To summarize, the Court's key conclusions are as follows: (1) Plaintiffs' motion to strike the body-cam video will be denied, though the Court has declined to consider that footage in addressing the instant motions; (2) the Officers have not demonstrated their entitlement to immunity at this stage of the litigation, and Plaintiffs' § 1983 excessive force and state law wrongful death claims against them may move forward; (3) as against Greensboro, Plaintiffs have plausibly alleged § 1983 municipal liability on a failure-to-train theory; however, the ADA claim cannot survive dismissal; (4) the Paramedics have not shown their entitlement to immunity on Plaintiffs' due process claim at this stage of the litigation; however, they are not liable for any alleged Fourth Amendment violations, and the wrongful death/medical malpractice claim against them must be dismissed as improperly pleaded;  (5) relatedly, Plaintiffs' motion for leave to amend will be denied; and, finally, (6) all claims against Guilford County must be dismissed.

**[Order to Follow]**

# ORDER

IT IS THEREFORE ORDERED that Plaintiffs' motion to strike, (ECF No. 41), and Plaintiffs' motion for leave to amend, (ECF No. 35), are DENIED.

IT IS FURTHER ORDERED that the Officers' motion to dismiss, (ECF No. 25), is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Counts 3 and 7. The motion is DENIED with respect to Counts 1, 2, and 6.

IT IS FURTHER ORDERED that Greensboro's motion to dismiss, (ECF No. 22), is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Counts 3, 5, 6, 7, and 8. The motion is DENIED with respect to Counts 1, 2, and 4.

IT IS FURTHER ORDERED that the Paramedics' motion to dismiss, (ECF No. 20), is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Counts 3 and 6; and to Counts 1 and 2 to the extent they allege a Fourth Amendment violation on the part of the Paramedics. The motion is DENIED with respect to Counts 1 and 2 to the extent they allege a Fourteenth Amendment violation on the part of the Paramedics.

IT IS FURTHER ORDERED that Guilford County's motion to dismiss, (ECF No. 17), is GRANTED as to all claims.

This, the 25th day of March 2020.

/s/Loretta C. Biggs
United States District Judge