IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 1:19-CV-386

| | |
|---|---|
| MARY SMITH, as Administrator of the ESTATE OF MARCUS DEON SMITH, deceased,<br><br>       Plaintiff,<br><br>v.<br><br>CITY OF GREENSBORO, Greensboro Police Officers JUSTIN PAYNE, ROBERT DUNCAN, MICHAEL MONTALVO, ALFRED LEWIS, CHRISTOPHER BRADSHAW, LEE ANDREWS, DOUGLAS STRADER, and JORDAN BAILEY, and Guilford EMS Paramedics ASHLEY ABBOTT and DYLAN ALLING,<br><br>       Defendants. | **OBJECTIONS TO MAGISTRATE JUDGE'S ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL** |

Pursuant to Federal Rule of Civil Procedure 72, Defendant City of Greensboro (the "City"), respectfully objects to the Magistrate Judge's 28 April 2021 Order, (D.E. 96), granting in part Plaintiff's Motion to Compel Defendant City of Greensboro to Produce Body Worn Camera Footage of Prior RIPP Hobble Incidents (the "Order").

**<u>Nature of the Matter Before the Court and Factual Background</u>**

Plaintiff brought this lawsuit after the death of her son, Marcus Smith, by filing a Complaint on 10 April 2019. (D.E. 1.) After the Court ruled on Defendants' motions to dismiss, (D.E. 20, 22, 25), four claims remain: (1) 42 U.S.C. § 1983 – Wrongful

Death; (2) 42 U.S.C. § 1983 – Survival Action; (4) 42 U.S.C. § 1983 – *Monell* Liability, only under a failure-to-train theory; and (6) State Law – Wrongful Death. (*Id.*)

Discovery in this case has been thorough and remains ongoing. On 19 August 2020, the City responded to discovery requests served by Plaintiff. (D.E. 85-2.) In answering a request for production for "[a]ll documents and communications pertaining to other incidents where RIPP Hobble or similar restraint devices were used to hogtie or otherwise restrain arrestees or persons otherwise in GPD custody," (*id.* ¶ 3), the City produced 327 incident reports that involved the use of a hobble, (D.E. 87 at 3). On 20 November 2020 Plaintiff, for the first time, requested by letter all the BWC associated with these incident reports. (D.E. 85-4.)

On 15 January 2021, Plaintiff moved to compel the BWC of incidents involving restraint by a hobble device: (1) by any GPD officer for a two-year period preceding 8 September 2018 and (2) by one of the Defendant officers without limitation as to time. (D.E. 85.) The City responded to the motion on 5 February 2021, arguing that the BWC Plaintiff sought was not relevant or proportional to her remaining claims and that under N.C. Gen. Stat. § 132-1.4A, the City is not permitted to release BWC without a North Carolina Superior Court order. (D.E. 87.) Along with the response, the City filed Declarations by Greensboro's Chief of Police Brian L. James, (D.E. 89), and Greensboro Police Department ("GPD") Lieutenant Adam Bell, (D.E. 88), outlining the burden on the

GPD if Plaintiff's motion were to be granted. Plaintiff replied on 17 February 2021. (D.E. 91.)

Without a hearing, on 28 April 2021 the Court granted Plaintiff's motion in large part. (D.E. 96.) It ordered the City to produce BWC corresponding to 50 incidents in which a hobble was used that most closely precede 8 September 2018. (*Id.* at 17.) The BWC from those 50 incidents must be produced within 45 days of the Court's Order, by 14 June 2021. (*Id.* at 18)

On 6 May 2021, under Local Rule 72.3, the City moved to stay the operation of the Order pending the Court's review and determination of the City's objections. (D.E. 97.) That motion remains pending before the Magistrate Judge, with an expedited briefing schedule. (*See* Text Order of 10 May 2021.)

## Standard of Review

Under Rule 72, a District Court "must consider timely objections and modify or set aside any portion of the [magistrate judge's] order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). In performing this review, the court may "receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C). While clear error review is "deferential," it is "not toothless." *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). An order is

Case 1:19-cv-00386-LCB-JLW   Document 100   Filed 05/12/21   Page 3 of 26

contrary to law if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Sandoval v. Starwest Servs., LLC*, 2018 WL 2426269, at \*1 (E.D. Va. Feb. 16, 2018) (citation omitted).

## Argument

The Order is premised on several errors of law and misconceptions of fact that the City seeks to correct through these objections. These errors relate to (I) the relevancy of the BWC to Plaintiff's claims; (II) the amount of BWC the Order requires the City to produce; (III) the burden of producing that BWC under North Carolina law and proper police practice; and (IV) the safeguards provided by the Protective Order.

Regardless of how the Court arrived at the conclusions set out in the Order, it has directed the City to violate North Carolina law. As a political subdivision of the State of North Carolina created under the General Statutes, the Order therefore places the City in a very difficult position. Beyond that issue, the Court's analysis that the terms of the Order significantly relieved the burden on the City with respect to review and producing these materials is erroneous. Because of the errors underlying the Order, the City respectfully requests, as set forth below, that the Court reverse the Order and deny Plaintiff's motion to compel unrelated BWC footage.

In addition to the arguments set out below with respect to the holdings in the Order, the City incorporates by reference its original brief opposing Plaintiff's motion to compel. (D.E. 87.)

4

## I. The Order erred by finding the BWC of 50 non-related incidents relevant in this natter.

As a threshold issue, Rule 26(b)(1) only allows discovery that is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1) (emphasis added). As an overarching theme that misdirected the Order's analysis, it states that the purpose of this lawsuit is "to seek police accountability for allegedly unconstitutional acts against citizens." (D.E. 96 at 12 (emphases added).) That is an incorrect view of this case—this lawsuit involves one individual, Mr. Smith, and his interaction with the GPD on one night, 8 September 2018.

The narrowed focus of the claims remaining in this suit was an important result of the Court's rulings on the motions to dismiss. (D.E. 58.) Those rulings had serious implications for the scope of discovery. While discovery has nonetheless been incredibly extensive, the Court's prior Order must be applied in the context of this motion to compel a huge and burdensome amount of BWC from unrelated incidents involving unrelated persons. Without any showing of any similarity between these events and what happened on 8 September 2018, despite Plaintiff's possession of significant information about the earlier incidents, the limit of allowable discovery has been exceeded.

The Order incorrectly analyzes whether the BWC it has required the City to produce is relevant to Plaintiff's single remaining *Monell* claim, a failure-to-train theory,[1] or her excessive force claim against the individual GPD Officers. Turning first to

---

[1] Of the four possible theories a plaintiff may use to establish a *Monell* claims, the Court dismissed the other three, including a persistent-and-widespread-practice theory. (D.E. 58 at 21-28.)

Plaintiff's remaining failure-to-train claim, that *Monell* theory requires Plaintiff to prove the need for "more or different training" that is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "A pattern of <u>similar constitutional violations by untrained employees</u> is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62-63 (2011) (emphasis added) (finding that other incidents "are not similar to the violation at issue here" and thus did not put the defendant "on notice that specific training was necessary to avoid this constitutional violation"). For failure-to-train claims, "<u>the focus must be on adequacy of the training program</u> in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390 (emphasis added).

The Order recites but does not address these requirements and therefore compels production of BWC that goes beyond what could be considered relevant for discovery purposes on Plaintiff's failure-to-train claim. In fact, the Order never defines what the actual "constitutional violation" at issue in the case is. *See Wright v. City of Chicago*, No. 09 C 3489, 2010 WL 4875580, at *2 (N.D. Ill. Nov. 23, 2010) (noting that "to set appropriate limits on discovery," the "first step in that process is to delineate what *Monell* claims are, in fact, raised by [the] complaint"). The District Court has identified the alleged constitutional injury, however, in the Order granting in part Defendants' motions

6

to dismiss: "severe injury" resulting from "improper use of a hobble restraint." (D.E. 58 at 25.)

The City has produced the full incident reports for each of the 50 incidents that are the subject of the Order, as well as for other incidents involving the use of a hobble restraint dating back to 2014.[2] Those incident reports commonly include information about any "injuries sustained by a subject prior to or during an encounter, any medical complaints made by the subject, and whether the subject received medical treatment at the scene, refused treatment, was involuntarily committed, or was transported to the hospital for treatment or transported to the jail." (D.E. 88 ¶ 29 (Bell Decl.).) Despite having all this documentation, Plaintiff did not identify any other incident when a hobble restraint was used in which the subject suffered an allegedly similar constitutional violation as is actually at issue here, much less any "severe injury." (*See generally* D.E. 84, 85, 91.) *See Volp v. Sasser*, 2020 WL 7024888, at *6 (M.D. Fla. Nov. 30, 2020) (finding that other incident reports did not show "notice of a need for additional or improved officer training" because "many of the incident reports illustrate incidents in which the inmate showed signs of aggression and did not suffer injuries because of an officer's use of force.")

---

[2] As noted in the City's underlying brief, (*see* D.E. 87 at 11-12), discovery regarding training has been broad: the City has produced over 4,500 pages of training materials and training files; the City has provided written interrogatory responses about training and identified personnel involved in training; and in depositions Plaintiff has questioned witnesses about their training and taken the depositions of other officers involved in training.

7

Instead of identifying the alleged constitutional injury at issue and evaluating whether Plaintiff had made a showing that the BWC of such an incident could be relevant to a failure-to-train claim, the Order essentially abdicated the Court's authority to make any relevancy determination. It relied on the fact that "Plaintiff reasonably expects that the BWC footage she seeks will bear on" her failure-to-train claim. (D.E. 96 at 8.) The "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26, cmt. Here, Plaintiff's argument, and the Order, lack any explanation of how, in the absence of <u>any evidence</u> of a "similar" constitutional violation, the BWC of unrelated incidents could be relevant to the failure-to-train claim related to the restraint of Mr. Smith. In the absence of any such showing, Plaintiff's unilateral expectation is not reasonable, nor should it have been a basis for the relevancy ruling.

To the extent the Order discusses relevancy issues for a *Monell* claim, it focuses on elements of *Monell* theories the Court has already dismissed. For example, the Order favorably notes Plaintiff's assertion that the BWC "could establish a pattern of Constitutional violations," based on "how long each person's legs were bent during the application of the hobble device, the amount of force used, and whether each person was hogtied in a prone position." (D.E. 96 at 7.) Similarly, the Order concludes that the BWC is relevant because it will show "the manner in which GPD officer <u>actually use</u> the device." (*Id.* at 8.) On their face, these are touchstones of a widespread-custom-or-

8

practice theory, not a failure-to-train theory.  But the Court has dismissed Plaintiff's allegations under a widespread-practice theory, finding them "too generalized and disconnected from the violation at issue" to proceed.  (D.E. 58 at 27.)  The differences between these theories, and the manner in which they may be proven at trial, are acute. Plaintiff's arguments, and the Court's conclusions, are completely divorced from the required elements of a similar injury, and have no bearing on the actual claim that remains in this case.  By ordering the BWC from other encounters involving GPD officers using a hobble, the Order has eliminated the distinction made by this Court between the persistent-and-widespread-practice theory and the failure-to-train theory. *See Bost v. Wexford Health Sources, Inc.*, 2020 WL 1890506, at *12 (D. Md. Apr. 15, 2020) (recognizing this distinction by noting that "[b]eyond an unconstitutional practice or custom, an entity may also be liable under *Monell* for its inaction," for "the failure to train, supervise, or discipline officers").

Additionally, the Order fails to address any of the caselaw cited by the City demonstrating that discovery of insufficiently similar incidents is not permitted.  (*See* D.E. 87 at 7-9.)  For example, in an on-point case, the plaintiff sought video surveillance footage of incidents that did not involve the plaintiff or the defendants.  Rejecting this request, the court held that the footage did not relate to the subject matter of the complaint, and did not show actual Constitutional violations, and therefore was not discoverable. *See Torbert v. Gore*, 2016 WL 1394268 (S.D. Cal. Apr. 8, 2016).  Notably, in all the briefing to date, Plaintiff has not provided a single case that supports the

9

proposition that BWC of other incidents involving unrelated persons could be discoverable.

Finally, the Order concludes that the BWC is "likely to be relevant to Plaintiff's excessive force claim against" the GPD Officers. (D.E. 96 at 8.) However, the excessive force claim in this case cannot be based on the officers' previous actions in unrelated encounters with unrelated subjects, but on their interaction with Mr. Smith on 8 September 2018. *See Segura v. City of Reno*, 116 F.R.D. 42, 44 (D. Nev. 1987) ("The liability of the individual police officer arises out of [a] particular incident."). Here, from our ongoing review of the 50 incidents the Order requires the City to produce, only 12 of the incidents involve any of the Defendant GPD Officers in some capacity at the scene according to the incident reports, in some instances not even as part of the process of restraining the subject. Moreover, even if factors like "the officers' motives, intent, knowledge, or preparation and the absence of mistake or accident" could be relevant to the excessive force claim – and the Order offers no explanation for how they could be relevant – the vast majority of the BWC has no bearing on those issues. (D.E. 96 at 8.) Therefore, any relevance of the BWC to these claims against the individual GPD Officers is negligible, particularly when compared to the resulting burden. *See Johnson v. New Jersey*, 2005 WL 8176025, at *4 (D.N.J. Aug. 5, 2005) (denying motion to compel other citizens' complaints regarding excessive force because the "[p]laintiff fails to articulate how evidence of the alleged use of excessive force by other officers who are not parties

10

to this suit in other incidents bears on" an analysis as to whether an officer's use of force was reasonable).

Finally, by compelling production of BWC from 50 other incidents, the Order presages a vastly more complex and ultimately irrelevant trial, that in addition to examining the evidence of what happened on 8 September 2018 and the training leading up to that event, will also include up to 50 mini-trials about other encounters involving (for the most part) non-party officers and, in every other instance, unrelated subjects. *See Estate of Bryant v. Baltimore Police Dept.*, 2020 WL 6161708, at *1 (D. Md. Oct. 21, 2020) (noting "the Fourth Circuit's disapproval of mini-trials within a trial, because of the time and expense involved and because the tangential allegations may cause juror confusion and unfair prejudice"). For each other incident that Plaintiff sought to introduce at trial, it would be necessary to explore the full context of the application of the hobble as captured on the BWC, including why it was determined that the hobble was necessary, how long the individual remained hobbled, and how the rest of the encounter played out. Multiple additional witnesses could be needed to testify about each incident. In the near term, the Order could open the door to additional discovery related to these 50 incidents, all of would have to be conducted in less than a month, between the Order's 14 June 2021 deadline and the close of discovery, 2 July 2021.[3]

---

[3] This timing was determined by Plaintiff. Although the City responded to Plaintiff's discovery requests in August 2020, (D.E. 85-2), Plaintiff did not seek the BWC until November 2020, (D.E. 85-4), and did not make a motion to compel until January 2020, (D.E. 85).

11

In sum, the Order improperly compels the City to produce BWC related to 50 incidents that are not relevant to Plaintiff's remaining claims under Rule 26.

## II.    The Order erred by claiming to only require the City to make a "limited production."

In three ways, the Order claims to have eased the City's burden; however, none of these are borne out by the facts.  First, the Order reflects an inadvertent misjudgment about the burden that it has imposed on the City by ordering the production of BWC related to 50 incidents.

Rule 26(b)(1) requires that the scope of discovery be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Factors considered in this proportionality analysis include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the <u>burden</u> or expense of the proposed discovery outweighs its likely benefit."  *Id.* (emphasis added)

Acknowledging the burden placed on the City and GPD to produce BWC, the Order sought to require only a "limited production."  (D.E. 96 at 17.)  It did so by compelling production of BWC associated with 50 incidents, instead of the 115 incidents Plaintiff sought.  (*Id.*)  However, well over a half of the BWC in the GPD's possession from the 115 incidents is associated with these 50 incidents.  As an initial calculation, the GPD has determined that these 50 incidents include 681 separate videos taken by 274 GPD officers, for a total of approximately 176 hours of footage.  (D.E. 99 ¶ 5.) Therefore, the ordered production of BWC is not significantly "limited" compared to the

12

115 incidents noted in the City's underlying brief, which involved 1,193 separate BWC videos from 504 officers totaling approximately 277 hours of footage. (D.E. 87 at 18.)

In similar instances, courts have found requests for BWC of other incidents overbroad. *See Nehad v. Browder*, 2016 WL 2745411 (S.D. Cal. May 10, 2016). In *Nehad*, the plaintiff's decedent was fatally shot by a San Diego Police Department ("SDPD") officer. The plaintiff alleged claims of excessive force, supervisory liability, and municipal liability under *Monell*. *Id.* at *1. In discovery, the plaintiff sought BWC of "incidents from 2010 through 2015 where an SDPD officer used force on a person who suffered from mental health issues or was under the influence of drugs and/or alcohol" and "where an SDPD officer used force on a person who was subsequently charged with obstruction of justice, failure to follow a lawful order, or other contempt of cop charges." *Id.* at *4. The court ordered the SDPD to produce BWC of incidents between the decedent and the SDPD "during the week leading up to the incident." *Id.* at *5. However, the court found that "it would take thousands of man-hours to search for and produce the recordings of incidents between the SDPD and individuals other than the Decedent" and therefore concluded that "the burden to obtain the footage and recordings … outweighs its likely benefit." *Id.*

Following this same logic, the City has already produced all BWC from four previous encounters between Mr. Smith and GPD officers. A Superior Court order was sought and obtained to allow the production of this BWC, with certain redactions.

Based on the sheer volume of BWC the Order requires the City to produce, the Order's goal of a "limited production" of BWC from the City was not achieved.

### III. The Order erred by incorrectly claiming to have alleviated the City's burden of production pursuant to N.C. Gen. Stat. § 132-1.4A.

The second way in which the Order claims to have eased the City's burden is by apparently requiring the City to produce the BWC without following applicable provisions of the North Carolina General Statutes for releasing such footage. Section 132-1.4A was enacted by the General Assembly in 2016 to codify the custody and release of BWC in North Carolina. *See* N.C. Gen. Stat. 132-1.4A. It only authorizes BWC to be released to certain persons and requires that prior notice be provided to various law enforcement personnel who are seen or heard on the BWC, the head of other law enforcement agencies whose employees are captured on the BWC, and the District Attorney. *Id.* Then, upon a petition to the North Carolina Superior Court and after a hearing, BWC can be released by court order, with whatever redactions or other limitations are directed by the Superior Court. *Id.* When the GPD has previously released BWC, including the BWC of Mr. Smith's prior encounters with the GPD during discovery in this case, it has been pursuant to this statute. The GPD strictly complies with its statutory obligations and has developed internal procedures to meet the requirements of the statute. (D.E. 89 ¶¶ 6-7 (First Decl. Chief James).)

As written, the statutory procedure for releasing BWC to a person who is not otherwise authorized to receive disclosure is mandatory. It provides that BWC "shall only be released pursuant to court order," and sets out only one process to obtain such an

14

order: "[a]ny custodial law enforcement agency or person requesting release of a recording may file an action in the superior court." N.C. Gen. Stat. § 132-1.4A(g). The statute sets out a series of factors that the reviewing court must consider in the context of the specific videos sought, including whether the release "is necessary to advance a compelling public interest," whether it "would reveal information regarding a person that is of a highly sensitive personal nature," whether it "may harm the reputation or jeopardize the safety of a person," and whether "[c]onfidentiality is necessary to protect either an active or inactive internal or criminal investigation or potential internal or criminal investigation." *Id.* The statute also sets out the requirement to provide notice to various persons, which can only be determined by a thorough review of each video. *Id.* (*See* D.E. 89 at ¶¶ 7-8 (First Decl. Chief James).)

Here, the Court did not follow these procedures, including by making the kinds of determinations required by the statute. It would seem to be impossible to do so for a blanket release of BWC that the Order requires, as opposed to the targeted evaluation of BWC the statute plainly anticipates. Thus, it does not appear that the Court intended to substitute itself for the Superior Court. Instead, the Order initially refused to determine how the statute applies in this context, acknowledging that "it is not clear that [the City] would be required to follow each of those procedures [found in section 132-1.4A] if this Court were to issue an order compelling production of the BWC footage." (D.E. 96 at 15 (emphasis added).) Without resolving the impossible position that this lack of clarity places on the City in its efforts to meet its obligations both to state law and to this Court,

15

the Order concluded *ipse dixit* that "the burdens arising from compliance with N.C. Gen. Stat. § 132-1.4A(g) … should be largely eliminated" because the City "need not comply with the requirements of N.C. Gen. Stat. § 132-1.4A(g) in making productions pursuant to a federal discovery order." (D.E. 96 at 15-16.)

How and why the City could be excused from complying with North Carolina's BWC disclosure statute is an issue of first impression. The Order contains no evaluation or ruling under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, that would allow the City to disregard the state statute or the Superior Court's mandatory role in the process of reviewing and releasing BWC. *See Hillsborough Cty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (noting that a preemption analysis under the Supremacy Clause is necessary to "invalidate[] state laws"). *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (recognizing that foundational principles of federalism caution courts against preemption of state laws "unless that [is] the clear and manifest purpose of Congress") (alteration in original).

Instead, the Order incorrectly analogizes N.C. Gen. Stat. § 132-1.4A to an evidentiary privilege like the spousal, attorney-client, and psychotherapist-patient privilege. (D.E. 96 at 10.) However, North Carolina's statute does not create this type of privilege.[4] It never uses the word privilege and instead provides a process—the only

---

[4] In its underlying briefing, the City did not conclude that the privilege analysis was the appropriate method to review N.C. Gen. Stat. § 132-1.4A, but simply noted that "in a similar context courts have decided that state statutes often control privilege issues." (D.E. 87 at 15-16.) However, the Order rejected the caselaw cited by the City because

method by which a North Carolina law enforcement agency may release BWC. Similarly, it is not a state confidentiality provision, like other caselaw the Order cites as support for disregarding the statute. *See Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000) (relating to Pennsylvania's confidentiality statutes for reports of child abuse); *C.V. by & through St. Pierre v. Epworth Children's Home*, 2018 WL 5112449 (D.S.C. Oct. 19, 2018) (relating to South Carolina's confidentiality statute for reports and information maintained by the Department of Social Services); *J.H.M. by & through Elliot v. S.C. Dep't of Soc. Servs.*, 2018 WL 3742613 (D.S.C. Aug. 7, 2018) (same).

This statute presents another unique issue. There is a greater impact on comity principles here, because unlike the other cases cited in the Order, the disclosure process required by Section 132-1.4A specifically requires a North Carolina Superior Court order to release BWC. In contrast, the two South Carolina cases relate to a state confidentiality statute that requires in-camera review by the judge in the relevant case, whether it is a federal or state judge, not specifically by a state court judge.[5] *See C.V.*, 2018 WL 5112449; *J.H.M.*, 2018 WL 3742613. Thus, the Order disrupts North Carolina's statutory scheme and without due regard takes away the authority of the Superior Court.

In disposing of the state statute, the Order relied heavily on its view that the City "appears to concede" and "acknowledge[d]" that the Court had the authority to order the

those cases that applied state law were due to "unique circumstances that are not present in this case." (D.E. 96 at 14 n.7.)

[5] Other statutes governing police records, such as N.C. Gen. Stat. §§ 132-1.4(a) (criminal investigative records) and 160A-168(c)(4) (personnel records) do not specify that a <u>state court</u> order is required for the release of covered materials.

17

production of BWC without further consideration. (D.E. 96 at 15.) On this important point, the Court appears to have misread the City's argument, which did not make any such concession. The City, at great length, discussed how the statute prohibited release of the BWC, and how if any release were to possibly occur, the City would have to comply with the statute's requirements. (D.E. 87 at 14-24.) To emphasize the fundamental importance and burdensome nature of the review process that is necessary to meet the statutory requirements, and to meet good police practices, the City noted that "[e]ven if this Court were to order the release of the BWC without going through the Superior Court process, the review and redaction of sensitive personal and law enforcement information would be critical and consume the same amount of time." (*Id.* at 22.) This point was followed by a citation to three paragraphs of Chief James' declaration, all of which discuss the statutory process. (*Id.* (citing D.E. 89 ¶¶ 7, 9-10 (James First Decl.)).)

The burden forecast by this passage of the City's initial brief has now come to pass. The Court has apparently ordered the City to produce the BWC without following the statutory procedure, but all of the requirements are law enforcement considerations that must still be addressed. In line with his first Declaration and the City's position in its underlying brief, in his Second Declaration, Chief James explains that for important law enforcement purposes, he would still direct the GDP to follow the department's standard procedures used to release BWC pursuant to the statute. (D.E 99 ¶ 7.) These procedures include full review of each BWC video; notice to law enforcement officers and other

individuals on the videos, other law enforcement agencies, and the District Attorney; and identification and redaction of sensitive and protected information. (*Id.*) Even under the Order's approach that the GPD need not follow the statute, the rationale behind these statutory provisions remains important. For example, notice to the District Attorney and heads of other law enforcement agencies whose employees appear on the BWC addresses the potential impact of the BWC release on ongoing criminal matters or the operations of other agencies. Similarly, from a very initial review of the 50 incidents, many include sensitive information: multiple incidents contain male and female nudity, at least one involves a suicide attempt, and a number involve minors as subjects or witnesses. (*Id.* ¶ 8.)

As noted in Section I, the City does not believe that any of the BWC should be released because it is not relevant to Plaintiff's remaining claims. However, if any BWC must be produced, it should be produced under N.C. Gen. Stat. § 132-1.4A, allowing the Superior Court a meaningful say in what BWC should be released and the redaction of sensitive or protected information. Responsible police practice also requires a thorough review of the video to address the same kinds of concerns. Therefore, the burden on the GPD would remain significant under the Order. The GPD's review of BWC subject to the Order has already started and involves seven ranking officers in the Professional Standards Division of the GPD. (*Id.* ¶ 12.) Considering the 176 hours of BWC related to the 50 incidents, Chief James notes that it will likely take at least several weeks for the GPD to review the entire BWC, make proper identifications of individuals for

19

notification purposes, and identify sensitive information in the videos and redact and edit the necessary portions.  (*Id.* ¶ 11.)  This process will continue to significantly disrupt the normal functions of the GPD, including the Professional Standards Division and the Police Attorneys.  (*Id.*)

**IV.    The Order erred by relying exclusively on the Protective Order to protect sensitive material in the BWC.**

The third way in which the Order claims to have eased the City's burden is by reasoning that the City can rely solely on the Protective Order regarding the compelled production of sensitive or confidential information in the BWC of the 50 incidents. Specifically, the Order recognizes that there are legitimate "confidentiality and safety concerns" in producing the BWC but finds that the concerns are "adequately address[ed]" by the Protective Order, (D.E. 96 at 13), without any need for the City to edit or redact the BWC before it is produced.  Implicit in this conclusion is that the City would also not need to undertake the time-consuming process to fully review all 176 hours of BWC either.

In reaching these conclusions, the Court appears to have overlooked the fact that the Protective Order was intended to operate in conjunction with the procedures of N.C. Gen. Stat. § 132-1.4A.  The Protective Order contemplates release of BWC, if at all, only pursuant to the provisions of the North Carolina statute.  For example, the brief in support of the consent motion for entry of a protective order states that "[a] protective order entered in this case will therefore allow the Superior Court to authorize a limited release of body-worn camera footage in the discovery process, subject to the protections set out

20

in this Court's order." (D.E. 78 at 6 (emphasis added).)  The Order even recognizes that the Protective Order "lays out protocols for the use of BWC footage produced by [the City] pursuant to N.C. Gen. Stat. § 132-1.4A and designated as confidential." (D.E. 96 at 13 (emphasis added).)  This is correct; the Protective Order specifically anticipates that the "Highly Confidential" designation may be appropriate for "body-worn camera footage in the event a state court authorizes the release of such footage with such a designation under this Protective Order pursuant to N.C. Gen. Stat. § 132-1.4A(g)." (D.E. 79 ¶ 3.b.)  Because the Protective Order did not anticipate release of BWC that would bypass the statute and protections therein, as noted above and in the Second Declaration of Chief James, (D.E. 99), the burden of following those provisions is not alleviated by the Order.  Instead, in addition to the conflict created by the Order's directive to not follow the statutory process, it creates an additional conflict between its language and the language of the Protective Order that specifically references the statutory process.

Similarly, the Protective Order does not achieve the Order's goal to "significantly reduce the need for [the City] to go through the lengthy process of redacting and clipping the recordings to the time-consuming extent Chief James has described in his affidavit." (D.E. 96 at 17.)  The Protective Order provides no meaningful protection for the extremely sensitive information the Order requires the GPD to produce about individuals who are neither parties nor witnesses to the GPD's interaction with Mr. Smith.  As noted, after only an initial review, the GPD has found that the Order compels the City to

produce BWC that includes minors and shows instances of nudity and attempted suicide. (D.E. 99 ¶ 8.) These materials should not be injected into this case for potential use at summary judgment motions or trial without additional protection. For these reasons, Chief James would direct the GPD to review the entirety of the BWC and edit, redact, or blur this sensitive information. (D.E. 99 ¶¶ 7, 11.)

The Order's reliance on the Protective Order is further undermined by the quickly-developing record suggesting that Plaintiff's counsel have improperly released discovery material to the media and others, as set out in Defendants' Joint Motion to Show Cause or for Other Relief with Respect to Potential Violations of Protective Order. In these circumstances, the mere designation of "especially sensitive information" as confidential does not appear to be a reliable way to assuage the City's legitimate concerns about the release of information that would typically be shielded from disclosure under the statutory process.

The Order supports its singular reliance on the Protective Order by incorrectly finding that the City "specifically contemplated" the production of additional BWC in its brief in support of the protective order. (D.E. 96 at 13.) That is incorrect. That brief does state that "other body-worn camera footage from other events may be responsive to discovery requests." (D.E. 78 at 5-6.) However, this statement was made in the context of BWC involving the GPD's previous encounters with Mr. Smith referenced in the City's Initial Disclosures. (D.E. 78 at 5-6.) And as noted above, the brief stated that the purpose of these provisions of the Protective Order was to "allow the Superior Court to

authorize a limited release of body-worn camera footage in the discovery process, subject to the protections set out in this Court's [protective] order." (D.E. 78 at 6.) In fact, the BWC from several other encounters with Mr. Smith were produced by the City after completing the statutory process. The GPD obtained a Superior Court order and also redacted certain sensitive information contained in that BWC pursuant to that order. The quoted statement was not referring to BWC that was unconnected to the GPD's encounters with Mr. Smith and does not support the Order's reliance solely on the Protective Order to shield sensitive and confidential information and material.

The Order turns the language on which it relies, from the Protective Order and the brief supporting entry of that order, on its head by finding that protections intended to facilitate the Superior Court's release of BWC involving Mr. Smith instead justify the release of BWC involved 50 unrelated incidents involving 50 unrelated subjects without following the Superior Court process at all. The Protective Order does not alleviate the City's burden of producing this BWC pursuant to N.C. Gen. Stat. § 132-1.4A or the lengthy review and editing, blurring, or redacting process necessary to protect the sensitive information contained in the BWC of the 50 incidents.

## Conclusion

For the reasons set forth herein, the City objects and respectfully requests that the Court reverse the Order and deny Plaintiff's motion to compel unrelated BWC footage.

This the 12th day of May, 2021.

/s/ Alan W. Duncan
Alan W. Duncan (NCSB No. 8736)
Stephen M. Russell, Jr. (NCSB No. 35552)
Hillary M. Kies (NCSB No. 46176)
MULLINS DUNCAN HARRELL
    & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@mullinsduncan.com
srussell@mullinsduncan.com
hkies@mullinsduncan.com

*Counsel for Defendants City of Greensboro, Payne, Duncan, Montalvo, Lewis, Bradshaw, Andrews, Strader, and Bailey*

24

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT</u>

The undersigned hereby certifies that the foregoing document complies with Local Rule 7.3(d)'s limitation of no more than 6,250 words (excluding captions, signature lines, certificate of service and any cover page or index) as counted by word processing software.

This the 12th day of May, 2021.

/s/ Alan W. Duncan
Alan W. Duncan

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was electronically filed with the Clerk of Court through the CM/ECF system, which will send notice of filing to counsel of record.

This the 12th day of May, 2021.

/s/ Alan W. Duncan
Alan W. Duncan